THOMAS v. ATLANTIC TRANSPORT CO., Limited, et al.

THE MINNEHAHA.

(District Court, E. D. New York. April 19, 1902.)

COLLISION—STEAMSHIP AND TUG—PREMATURE FASTENING OF LINE.

The Minnehaha, a large steamship 600 feet long, while slowly making her way under her own steam to her berth in North river, and when some piers below it, was approached by a tug, which had been employed to assist her in docking. The tug came close alongside, and called for a line, which was passed out and made fast on the tug by two deck hands. The tug then went ahead somewhat faster than the ship, but in a parallel direction, drawing out the line until she was even with, or ahead of, the stem of the ship, when the line was made fast on the ship, and the tug, by the force of the wind and tide, swung in front of the ship, and was struck and sunk, the two deck hands being drowned. Held, that the tug, by steaming alongside instead of keeping off, placed herself in a more dangerous position, and that upon evidence, a preponderance of which showed that the line was made fast on the ship on the signal of one of the deck hands on the tug, the ship could not be held in fault.

In Admiralty. Suits for injury of a tug in collision and for the death of one of her crew.

Hyland & Zabriskie, for libelant Esther E. Thomas.

James J. Macklin and Wilcox & Green, for respondents Millard et al.

Convers & Kirlin, for respondent Atlantic Transport Co.

THOMAS, District Judge. On the 18th day of September, 1900, the steamship Minnehaha, claimed to be the third largest vessel coming into the harbor of New York, was bound for and several piers below her berth, Pier 39, foot of Houston street, North river. The wind was strong from the northwest, and the tide ebb. While the Minnehaha was thus under her own steam, approaching her pier, three tugs came alongside, two taking their positions off her starboard side or quarter without in any way making fast, and the tug America coming to the port side, and calling for a line when her starboard side was some six feet from the steamer. These tugs had been employed to assist in docking the steamship. There was at this juncture no occasion for the America receiving a line, as it was her duty to assist the steamship in docking at Pier 39, by taking a line, and thereupon standing off from the steamship's course, and holding the steamer's head up against the tide as she swung into her berth. Hence the America's arrival was premature. Nevertheless, the steamship acquiesced, and passed a line from the second chock, which was some 80 feet aft of the bow of the vessel. The America was about 60 feet long. The Minnehaha was about 600 feet in length, with a beam of 65 feet, and without cargo. The distance from the level of the water to her main deck at the stern was about 40 feet, and from the water to the bridge about 70 feet, the bridge being situated about 200 feet aft of the stem head. The America carried a crew of five men, the captain, who was alone in the pilot house, the engineer and fireman, who were in the engine room, the deck hand and cook, who were on the stern of the vessel receiving and handling the line which they made fast to the tug's bitts, which bitts, 40 feet aft of the pilot house and 12 or 15 feet from the stern, were concealed from the view of the tug's master. The freeboard of the America was 5 or 6 feet, and the top of her smokestack showed just above the steamship's deck, which had an open rail. After the line had been received from the steamship by the tug, the latter went ahead, carrying out the line with her, and making somewhat more headway than the steamer, which was going very slowly, when in some manner the tug went in front of the stem of the steamship, was struck by the latter, was driven under water, the deck hand and cook were drowned, and the other members of the crew thrown into the water and rescued. One of the libels is filed for the death of the cook, and the other libel for injury to the tug.

There are several allegations of fault against the steamship, but one only is reserved for discussion, viz., that the line was made fast on the steamship before sufficient had run out, and without orders from the tug, so that the tug was violently stopped in her forward progress, and thrown in front of the stem of the steamship. There is a sharp diversity in the contentions respecting the distance the tug had gone forward before the line was made fast, as it undoubtedly

was. The libelants claim that the tug had not cleared the stem of the steamship, while the claimant urges that her stern had cleared the stem of the steamship by some distance, and that the tug had been steaming ahead for some minutes before the accident occurred. One conclusion is easily reached, that the accident to the America was caused by the fact that, instead of keeping off from the steamship, she steamed alongside of her, and that the making fast of the line abruptly checked her speed, whereupon the northwesterly wind and ebb tide threw her in front of the larger vessel. The fault of being in too close proximity to the steamship was that of the tug. She was not wanted there, she could perform no duty at the time, and, if it was not negligent for her to be in that position, yet there was danger in it, and that danger, so far as it arose from her position, she herself assumed. But, nevertheless, she had a right to assume that the line would not be made fast on the steamship until orders were given to that effect by the tug. When the line was passed over from the steamship to the tug, the boatswain called out to the men on the deck to "sing out when they had enough line." The captain of the tug states that he did not hear this, but as he was in the pilot house, and to the windward, it is not strange that he did not hear it. But whether anything of the kind was said is unimportant, for it is expectable that such would be the procedure. The captain of the tug was facing away from the stern of his vessel. He was in no position to hear or see what the men on the stern of the tug said or did, and as both such men were lost the evidence is entirely in the hands of those upon the steamship. The evidence of the steamship is that, after the line had run out for such a distance as to allow the tug to precede the steamship, one of the men on the stern of the tug called out "to make fast," holding up his hand at the same time, and that thereupon the line was made fast. If such was the fact, it is impossible to find the steamship in fault; but this evidence, in detail, will be later considered.

The libelants urge that there were certain facts and circumstances from which it is inferred that there was no such direction given by either of the men on the stern of the tug, and that in any case, if such order had been given, the steamship company should have disregarded it, unless it came from the captain of the tug, and evidence is offered that it is the custom of the port for the master or his mate to give such orders, and that they do not suitably come from deck hands. But there was no mate, the captain was in no position to give the order, and the evidence on the part of the steamship is that orders of that nature are not limited to the officers of a tug. So that the case narrows itself down to this, was the direction given?

The disposition of the line and the men on the steamship may now be explained. The hawser, an 8-inch rope, with a total length of 120 fathoms, was coiled close to the rail just abaft the bitts, which was 8 or 10 feet aft of the chock. After certain of the hawser had been run out, stated by respondent's witnesses to be 30 or 40 fathoms, one of the men on the tug signaled with his hands, and sang out to make fast, and this was immediately done. Thereafter the three seamen remained at the bitts, but received no order from the tug. After

the line was made fast on the steamer, the two men on the stern of the tug left their position at her bitts, and one of them was seen going forward on the starboard side. The boatswain at the time she was made fast stood some distance forward, and in immediate charge of the men who were handling the hawser, and Crichton, the chief officer, was at the stem. Nilsen, one of the three at the hawser, states that one of the men standing aft on the deck sang out, "Make fast;" that he (Nilsen) could not see the man without going to the rail of the steamship, which he did not do, but he distinctly heard him. He was uncertain whether there were two or three men aft on the tug. Wilson, the boatswain, states that there were two men on the after-deck of the tug, and that they made the hawser fast on the tug by putting the eye over the bitts. He gave this evidence:

"Q. And by whose direction was it made fast? A. By their singing out from the tugboat, and raising of a hand to make fast. I repeated the order. The men were already doing so. They evidently took it from the tug. Q. What were the words of the man on the tugboat that you heard? A. 'Make fast,' holding up his hand at the same time. Q. Do you know this tugboat from previous experience? A. Yes. Q. Do you know the men? A. I don't know the men personally. Q. Can you state whether that was the usual signal? A. Yes; the holding up of one or two hands to make fast or hold on. Q. What did you say when you heard these words, did you say? A. 'Make fast.' Q. You sung out, 'Make fast'? A. I sung out, 'Make fast.' Q. The men had already begun? A. Had already begun to make fast. Q. Was it made fast then? A. It was made fast. Q. Whereabouts was the tug with reference to your vessel at that time? A. She was ahead of the stem, a little off to port."

Crichton, the chief officer, testified as follows:

"Q. How far was the stern of the tugboat ahead of a line straight across from your stem? A. Somewheres about 80 feet, I think. Q. What occurred then? A. They held up their hands, and sung out, 'Make fast.' Q. Who did that? A. One of the two hands on the lower deck. Q. The same men who had taken the line? A. The same men who had taken the line. Q. And made it fast? A. And made it fast. Q. Was that order obeyed on your boat? A. Yes, sir; made it fast at once. Q. Did you see the line made tight yourself? A. I saw the line was fast because the tug went ahead immediately. By the Court: Q. Where was the man who made that signal? A. Abaft the house on the tug, standing abaft the house on the main deck."

It is claimed that this evidence is impaired by the subsequent statement of the witness, which was as follows:

"Q. You say you saw the man lift his hand on the lower deck, or the two men? A. One man. Q. That was when the boat was how far ahead of you? A. About 60 feet from the stem. Q. What did he say, if you heard him say anything, besides holding up his hand? A. I can't remember. Q. Did he say anything at all? A. He shouted something,—'Make fast,' or 'Hold on,' or something of that kind. Q. You couldn't tell what he said? A. I couldn't tell what he said. Q. Do you suppose a man 75 feet abaft of you could tell what he said? A. He might. Q. Further away from the America than you were? A. He might have heard. I wasn't paying attention to the word,—I was looking for the motion. Q. Did he put up two hands, one, or what? A. Two hands. Q. What was he doing there at that time,—anything more than standing there? A. No; just standing there. Q. You knew he was the deck hand from the position he occupied? A. Yes, sir; one of the men."

There are some discrepancies in this evidence, but they are not of a substantial nature, or other than might be expected from three

honest witnesses who had taken different parts in a transaction, and were severally trying to give their recollections of it, and their narrative must be accepted. Indeed, if the issue must be determined whether the stern of the tug was some distance in advance of the stem of the vessel, the evidence on the part of the ship, in the number of witnesses, is greater than that of the tug, and it was not apparent that the witnesses for the steamship, in their manner of testifying and clearness of narration, were inferior to those of the tug. The disaster, resulting in the loss of life of two men, brings before the court litigants whose unfortunate condition requires a careful consideration and estimate of the evidence, but it seems clear that the libelants have not sustained the burden which rests upon them of showing that the accident arose from the culpable negligence of the ship. On the other hand, it appears, aside from any presumption of freedom from negligence, that the ship did not contribute to the accident, but did as directed by the men upon the tug.

The libels herein are dismissed.